

FILED
11/17/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
EW

1. Plaintiff, Charles Portis ("Portis" or "Plaintiff"), a resident of Evanston in Cook County, Illinois and previously a resident of Chicago in Cook County and Highland Park in Lake County brings claims of action against Brian Whiting ("Whiting" or "Defendant"), a resident of Elkhorn in Walworth County, Wisconsin and previously a resident of Evanston and Chicago in Cook County and Richmond in Lake County, Illinois for Civil Rights violations (42 USC, 1981) as well as for Intentional Infliction of Emotional Distress beginning in 2003 and continuing at least until November, 2021.

2. In March, 2019, and again in November, 2021 Plaintiff sought, and Defendant agreed, to meet. At the March, 2019 meeting at One South Wacker Drive, Defendant referred to Plaintiff as a "kike," to Plaintiff's face. At the November, 2021 meeting at Gage on South Michigan Avenue, Defendant repeated and enjoyably tormented Plaintiff with more of his carefully crafted lies about Plaintiff, which lies had been then ongoing for nearly twenty years and which had cost Plaintiff millions of dollars of earned wages and which, intentionally, had made Defendant feel a deep and biting lack of agency and severe emotional distress for two decades. Defendant had employed, and continued to employ at the November meeting, the manipulation form known as "gaslighting" against Plaintiff.

3. After the Kristallnacht pogrom, November 9-10, 1938, the Nazis sent the *Jews* bills for the damage done. Historians view the event as prelude to "The Final Solution," or the murder of 6 million Jews. Hitler gaslighted the Jews before he gassed them, but both revealed the systemic dehumanization of a people. In gaslighting a lie told by a party in power (the gaslighter) is used to intentionally abuse and steal power from the less empowered (the gaslighted). Sometimes, the gaslighting is then paired with "scapegoating," such as sending the Jews bills for damage inflicted by others, as, being Jews and by the tautological logic of antisemitism, they were always to blame.

4. Charlie Portis grew up in Highland Park, Illinois. He was confirmed from Lakeside Congregation for Reform Judaism in 1978, graduated Highland Park High School in 1980 as National Honor Society President and attended Yale and The University of Michigan (1984) for undergrad. His Father, Jack, was an apparel salesman and his mother, Eleanor, managed a showroom in the Merchandise Mart before marriage. Jack and Eleanor together opened a "Bresler's 33 Flavors" ice cream shop in Winnetka, Illinois in 1977, when Charlie was 15; working there was his first job. Later, through high school, he worked at Williams Ski Haus, in Highland Park, and developed a love of skiing.

5. At Michigan, Plaintiff and a partner planned Spring Break trips to Aspen, Colorado that, along with his GPA, were successful enough as a business to earn him admission to the University of Pennsylvania's Wharton School of Business, where he made Director's List (Dean's List) and graduated in 1986 with an MBA in Finance and a Concentration in Real Estate.

6. Defendant grew up the youngest of 7 children in Richmond, Illinois, near Antioch Illinois and his present residence in Elkhorn, Wisconsin. Upon Information and Belief, Defendant did not significantly encounter Jewish people until he attended Northwestern University. After graduating in 1987, Whiting worked for

downtown Chicago real estate brokerage/development firms including Dean Topping, Golub and M & J Wilkow where, upon information and belief, for the first time he came into contact with Jewish people as coworkers, clients and, ostensibly to Plaintiff, friends.

7. Ultimately, Plaintiff and Defendant would work together for Former Employer Witness ("FEW" or "Former Employer") at "Former Employer & Associates," Plaintiff beginning in 1999 and Defendant on our about 1997. For the first 10-12 years of their respective careers, Plaintiff's achievements had outstripped Defendant's. Portis had achieved success in *both* Downtown and Suburban Office Leasing and in 1996, as part of a leasing team at The John Buck Company, he received his first Greater Chicago Food Depository Commercial Real Estate Award (the local industry's recognized "Oscars") for leasing Sears Tower. Defendant Whiting had, prior to working with FEW, not received any awards and had worked only as a downtown product broker, with little if any experience in suburban leasing or in representing tenants.

8. By the late 1990s, Former Employer & Associates was regarded as a successful "boutique" downtown office leasing agent. The firm had been featured on the cover of Crains Chicago Business, with Former Employer described as "Mr. Fix It" for his leasing downtown in the mid 1990s. However, for the ten years of the firm's existence, when Plaintiff was hired to lease a project in Northbrook, **neither Defendant nor Former Employer had had any significant success leasing in the suburbs.**

9. Former Employer retained Portis in 1999 and through his first four years Plaintiff "killed it" in the suburbs, leasing over 200,000 square feet of speculative Class A office space in Northbrook and 130,000 more in Lake Forest in a building developed by Former Employer. Plaintiff also providing key leasing work downtown for FEW. From 1999-2003, while Defendant built a substantial downtown leasing "practice" for Former Employer, Plaintiff did the same in the suburbs.

10. Defendant Whiting had worked as a downtown product leasing agent and had successfully renovated a home on Alta Vista Street in Wrigleyville. When he joined Former Employer, he was given agency on that firm's most important and long-held listing-- Prudential Plaza. In 2001, Defendant sought Plaintiff's leasing assistance at 444 North Michigan Avenue and Plaintiff was paid fairly and appropriately on that listing. But, mostly, Plaintiff was building up the firm in the suburbs, while Defendant, along with other brokers hired from 2000-2003, built downtown along with FEW.

11. During this period, 2001-2003, Plaintiff and Defendant shared some clients at Former Employer & Associates including Real Estate Developer Witness #1 (RED1). Plaintiff Portis was leasing a suburban building developed and owned by RED1, while Defendant Whiting and Former Employer were leasing RED1's latest and most significant work to date, a major West Loop redevelopment.

12. Around 2003, Defendant asked Plaintiff to work with him on another downtown listing at 233 North Michigan for Defendant's latest client, Parkway Realty, a real estate investment trust from Jackson, Mississippi. Defendant had become friendly with the client's local manager from Jackson, Real Estate Executive Witness #1

(REE1). Whiting told Portis that to impress this client in a tough market Portis must commit to cold call. Portis agreed and spent significant time cold calling, per Whiting's direction. However, Portis never saw Whiting make a cold call, though he appeared to enjoy wielding authority and dominance over Portis in reminding the Jewish man regularly to cold call for this property while he never did.

13. 2003 ended up a pivotal year for Whiting. RED1 found a buyer for his West Loop property. As Whiting and FEW had leased the building substantially but not totally, the new owners, Real Estate Developer Witnesses 2 and 3 (RED 2 and 3), retained existing leasing (Former Employer & Associates) and management (RED1). RED1 had a long track record for quality development and management and his firm took particular pride in the quality of their management. RED1 asserted to Plaintiff, however, that just months after the new owners took control his firm was fired from property management via trumped up claims of tenant dissatisfaction. According to RED1, Whiting misled RED2 & RED3 that management was substandard and encouraged his new clients to fire the building's developer in favor of the local office of a large national firm. RED1, RED2 and RED3 are all Jewish men.

14. Defendant engaged in gaslighting and scapegoating of others for his own benefit and without any sense of loyalty, decency or humanity. RED1 had hired Whiting and Former Employer to lease his most important project and paid them hundreds of thousands in commissions. But Whiting saw in RED 2 & 3, Jewish men from New York with strong appetites for risk and capital to match, an opportunity that he simply would not "share." As soon as RED1 could be possible competition to him in his quest to control Red 2 & 3's future Chicago ventures, he lied that tenants were complaining about property management and scapegoated one Jewish man to two others to assert his own power and control. RED1 lost hundreds of thousands in possible future management fees, (but had made millions on the sale of the building) and never forgot Defendant's bare-knuckle Machiavellianism. And, beneath Defendant's lies is his clear worry that a Jewish man, and one with much deeper understanding of real estate development than him, could be a valuable resource to RED 2 & 3 (i.e. a threat to his control of them) and therefore must simply be competition snuffed, no matter the means. To Defendant, Jews are "others," to be flattered, cajoled, lied to and used by White Christians like himself as necessary.

15. Also in 2003, Plaintiff succeeded, at 233 North Michigan, in finding a tenant via cold calling, a substantial achievement that, upon information and belief, must have deeply upset Defendant. After Portis' cold-call accomplishment at 233 and success across the suburbs, Whiting apparently decided to destroy Portis' downtown leasing career and thus ensure that Portis NEVER meet REDs 2 and 3 nor pose any possible threat to his ability to control them. Again, upon information and belief, Whiting feared that Portis' accomplishments, combined with his education and religion, could make him an attractive resource to his new clients. As with RED1, Defendant would simply tell the lies necessary to achieve his desired outcome. Eventually, nine years later, though legally they belonged

to Former Employer, Defendant would take RED 2 and 3 to his own new company, Telos, from Former Employer & Associates.

16. Starting in 2003, concurrent with Defendant's introduction to RED 2 & 3 after their purchase of RED1's West Loop redevelopment, Defendant began a campaign of gaslighting, fraud, scapegoating and slander designed to degrade, demean and inflict severe financial and emotional distress upon Plaintiff, a campaign rooted in Plaintiff's being Jewish and Defendant's virulent antisemitism. Long after Defendant's early machinations had neutralized any "threat" Plaintiff might pose downtown, Whiting sought to utilize Portis' considerable abilities and contacts to secure substantial business opportunities that he could otherwise not secure, and then systematically and with ever increasing boldness lie to divert Portis' rightful earnings to himself, Respondent in Discovery/CoConspirator Dru Shoemaker, and Respondent in Discovery/Coconspirator John Wiechart (all, upon information and belief, Catholic like Defendant). Defendant's goal was, and remains, to reduce Plaintiff's income and self-esteem to zero. That goal is a feature, not a "bug," of a true antisemite.

17. First, at Plaintiff''s 2003 year-end "settlement" with his Former Employer, Portis was informed by FEW that his stellar work on 233 Michigan was unacceptable and substandard, according to Brian Whiting's report. When Plaintiff asked for examples, none could be found. In 2018, Plaintiff would learn from REE1, the relevant decision maker, that there was no truth to the assertion that Portis' work had been criticized, which FEW apparently nonetheless believed at the time. Thus, for 2003, while Plaintiff was entitled to be paid for all transactions at 233 North Michigan; instead, he was paid ONLY for the transaction he had personally cold-called to the building. The deeper purpose of Whiting's lies to Former Employer, though, was to eliminate Portis as a downtown broker, not despite but BECAUSE of Portis' accomplishments downtown as well as Portis' status as a Jewish man.

18. Whiting again revealed his drive to destroy Portis' career, income and self esteem in 2004. Five years earlier, Portis had been leasing Olympia Centre, 737 North Michigan Avenue, commonly known as the "Neiman Marcus" building, for another firm and had presented a unique idea to CBS, which had just begun looking to relocate from its old McClurg Court location. Portis discovered that the lowest office floors of the building could be made to open onto the roof of Neiman Marcus, allowing a glassy, high visibility CBS television studio built at Michigan and Chicago Avenues adjacent to Chicago's most classic symbol, the old Water Tower. Portis worked out the idea with famed architect Adrian Smith, then of Skidmore Owings and Merrill; 737 Michigan had been his first Chicago design. CBS put the project on hold for years, but, by late 2004, Portis realized that while CBS was close to committing to a new building at Block 37, the opportunity for the rooftop studio was now open again as the necessary adjacent office space in the lowest tower floor had recently become available.

19. When Plaintiff, in late 2004, mentioned the CBS/Neiman Marcus concept to his Former Employer, he suggested Portis talk to Whiting, as Whiting's old firm, M & J Wilkow, was now leasing the building for new ownership and Whiting was

close with the leasing agent, Jack O'Brien. Portis entered Whiting's office the next day, briefly described the idea and asked for help with a connection to O'Brien (whom Portis knew but not well). Defendant Whiting reacted by screaming at Portis, "Get the F*&k out of my office! That's a stupid idea that will never go anywhere so don't waste my time. Get out of here!"

20. Plaintiff Portis was shocked both by the tone and content of Whiting's response. He did not NEED Whiting's help, but he was essentially offering an opportunity to help pursue a good, but longshot, idea. But, by 2004, Whiting had already decided, for Portis, that Portis' downtown leasing career was over. Defendant would brook NO competition from Portis, and he would especially not help Portis with a project that if successful would make Portis more competitive downtown. Thus, he screamed at this Jewish man in another effort to assert his dominance.

21. At the time, Plaintiff was more amused than disturbed. He called Jack O'Brien and when O'Brien heard the idea, he was excited. Portis then met extensively with Gordon Gill (then Mr. Smith's colleague at SOM and later his partner at Smith Gill) who created a futuristic, almost magical glass studio atop Neiman Marcus' roof that put the famous CBS "eye" atop the hub of Michigan Avenue. In December, 2004, Gill, Portis, FEW and O'Brien met a CBS executive, Fran Preston, and her team, in a conference room at the Peninsula Hotel overlooking the site. After the presentation, Ms. Preston, visibly impressed, asked "Where have you been?" (The answer was that the needed office space had not been available until recently). However, the station manager, Joe Ahern, had already decided that CBS would leave Streeterville for downtown, regardless of how highly his #2 thought of this new opportunity.

22. Former Employer commended Plaintiff at the end of 2004 for the "CBS" effort, yet Defendant's lies to FEW had, unbeknownst to Portis, already destroyed Plaintiff's downtown leasing career. But, those deceits and deceptions would pale in comparison to 2005 to 2007, when Whiting would twice use Portis' knowledge, skills and track record to secure two massive suburban assignments and then lie, gaslight and scapegoat to shunt Portis' rightful earnings to himself and two non-Jewish co-Conspirators.

23. In 2005, through his relationship with M & J Wilkow, Defendant informed Plaintiff and Former Employer that he had uncovered a huge Naperville opportunity. Wilkow and investor Cargill sought to transform two vacant Lucent Technologies office buildings, built out, as FEW described it, as "rabbit warrens." By 2005, Portis had established the firm's substantial suburban track record in the North and Northwest suburbs. This 550,000 square foot, two building challenge, should have been the payoff for that work. Instead, Defendant schemed to utilize Portis then abandon him for the pleasure of watching a Jew's rightful pay go to a non-Jew of his choosing. Portis had both named the project, "Naperville Woods Office Center," and provided the credibility to "pitch" the team of Plaintiff, Defendant and FEW1 to Wilkow to help hire architects, envision, market and lease this huge turnaround. If successful, leasing commissions would total millions of dollars.

24. After the presentation to Wilkow personnel including John Wiechart and Cliff Wilkow, Portis felt very positive about their chances. The two other companies vying

for the business included a large national firm whose East/West corridor "heavy hitter" was a scratch golfer and master networker and another local brokerage firm that had recently completed a huge transaction in Naperville. Whiting walked into Portis' office with news he had just conveyed to FEW. First, Defendant shook his head and looked at his hands, not at Plaintiff, and asked, "Do you know any reason why Slandered Real Estate Broker ("SREB") said vicious things about you?" Portis was shocked and confused. Whiting was claiming that the principal of one of the other firms trying to lease the building had singled him out and said "vicious" things about HIM to Wilkow. "No Brian," Plaintiff replied, I don't really know "SREB," Portis replied. Plaintiff felt extreme distress and disorientation when Defendant lied to him that another man, who also happened to be Jewish, had slandered him to the client. It made no sense, at the time, but felt horrific. In Plaintiff's later journaling as part of therapy, when he later confirmed that Whiting was lying, he wrote, *"when the aforementioned entered my office and was so "upset" about the "vicious vicious" things purportedly said about me (lies all) and I felt the sinking feeling of one wrongly accused, I chalked it up to somehow being MY fault. And there it goes, this turning inward to find out what I did wrong, the victim's symphony. I wracked my brain trying to think about what vicious thing someone who did not know me might say:*

*"He was confirmed but never Bar Mitzvahed, what the hell kind of Jew is that?"*

25. But Plaintiff's lies about competitors whispering "vicious" things about him did have a purpose. When "Former Employer & Associates" was awarded the coveted project, Portis and Whiting's names were both on the listing agreement as "Designated Agents" and Portis worked on all the front-end planning and marketing, attending meetings with the client, architects and graphic designers. The team of Portis, Whiting and Former Employer got the project ready for market. Then, just as some early, smaller transactions were approaching fruition, FEW called Portis into his office. Just as on 233 North Michigan two years earlier, FEW now had rough news for Portis. "We have to get you off this project," he said. "What project?" Portis asked. Now, Whiting had reported that Real Estate Executive Witness 2 (REE2) wanted Portis off the project, that the "vicious" things that had been said about him had led to questions and now Portis would no longer work on his own project. Instead, Former Employer and Defendant had identified a broker with few prior accomplishments, Dru Shoemaker, who needed work. Respondent in Discovery/Coconspirator Shoemaker was installed to take 90-95% of Plaintiff's rightful earnings on Naperville Woods Office Center. FEW apparently believed Defendant's lies and Plaintiff, though tormented and upset, could not grasp what was happening, only that it was distressing and awful and, over the next two years, would cost him approximately $550,000.

26. Plaintiff spent 2006 watching Dru Shoemaker be compensated for his work in Naperville. FEW had asked Plaintiff to secure a listing near O'Hare and Portis had done so at a Rosemont building. So, when Whiting uncovered ANOTHER major suburban opportunity, this one near O'Hare, and asked Portis to tour the Citicorp Plaza complex with the client's Acquisitions Director, once again Portis felt another suburban challenge that would be payoff for his earlier work creating suburban credibility for his firm. Instead, as soon as the Parkway Realty, the firm then -locally

headed by REE1, bought the complex, Whiting again entered Portis' office, to tell Portis with barely concealed glee under his razor-calm affect, "Yes, Charlie, the client does not want you working on these buildings. Frankly, they don't want you working on any of their buildings."

27. Plaintiff, upon hearing those words and learning that once again barly competent Coconspirator Dru Shoemaker would be installed to receive his rightful earnings, felt deep humiliation. As Portis learned from REE1 in January, 2018, none of this was true. Defendant simply lied *to Portis and FEW that the client wanted Portis gone*, then lied *to the client* that FEW had decided to change agents. Again and again, Whiting felt license to gaslight and scapegoat the Jewish Portis. There was no chance either suburban project could have been secured without Plaintiff, but all his subsequent rightful earnings were diverted to Defendant's White Christian coconspirators and himself. Until 2009, Portis strongly suspected Whiting of lying but could not definitively prove it. Plaintiff understood that at "Former Employer & Associates," these clients were "Brian's," even though legally they belonged to FEW, and had Portis breached protocol by demanding answers directly from the clients his very job would be at risk. Plus, Portis trusted Whiting and FEW as he had always treated *them* with honesty and dignity.

28. In March, 2009, Wilkow employee John Wiechart asked Plaintiff to lunch to discuss the economics of suburban office condominiums. By then, Plaintiff and FEW had developed a successful office condo project in Northbrook. At then end of the lunch, years after Plaintiff had been deprived of massive commissions on the project in Naperville that he had named and still bothered by Whiting's story, Portis asked Wiechart, "John, I know it's a while ago, but, back when we pitched the Naperville project, I know that 'SREB' said some supposedly vicious things about me. What did he say? I've always been curious?" Wiechart responded with a dumbfounded look and responded, "You? No one said anything about you personally. It got heated; the other firms said your team had no experience in Naperville. But no one said anything about you personally."

29. Plaintiff then understood, beyond doubt, that Defendant's claim of another Jewish man saying awful things about him had been used for both Defendant's enjoyment of the lie and the disastrous effect the lie would produce for Portis' career. When Plaintiff told Former Employer about his discovery, his employer told him, "Well that's between you and Brian." When Plaintiff confronted Defendant about the lie, Defendant got briefly nervous and then assured Plaintiff that "someone there said vicious things about you." In other words, when confronted by Plaintiff, whether in 2009 or 2021, and asked to simply acknowledge truth, Defendant has and always will repeat lies that he knows were, and are, deeply damaging to Plaintiff. The gaslighting (saying someone said "vicious things about you" followed up with "the client wants you off the account") pairs beautifully with the antisemite's favorite "sport," scapegoating ("this is all YOUR fault Jew.")

30. In 2012, Defendant Whiting left Former Employer & Associates to form Telos Group. Though RED 2 & 3, legally, belonged to Former Employer, Defendant took these key clients with him. Over the next ten years, his work for these clients would be among the most consequential in downtown Chicago. Former Employer & Associates would be largely hollowed out by Whiting's defection and would be sold

to a national real estate firm in 2015. Upon information and belief, Whiting's strategy to isolate RED 2 and 3 first from another Jewish Real Estate Developer (RED 1), from Plaintiff and, ultimately, from Former Employer succeeded wildly, earning Defendant dozens of millions in fees from 2012-2022. And, Telos' success with its key New York-based client led to other prime Chicago assignments, including representing Chicago's largest and tallest office building, whose owner's CEO, Real Estate Executive Witness 3 (REE 3) is also a Jewish man who, like Plaintiff attended Highland Park High School. And yet, even with this impressive roster of important Jewish benefactors, upon information and belief, after over ten years Telos has somehow never found a single Jewish employee to share in its unparalleled financial success.

31. In 2015 a mutual neighbor of Plaintiff and then-Evanston resident Defendant, Neighbor Witness ("NW") told Plaintiff that at neighborhood poker games, Whiting would explain that "Brian said he and his Former Employer had a partnership and when they dissolved the partnership, they divided up the accounts." Portis understood then, and now, that there had never been an actual partnership and that the firm had always been fully owned by Former Employer. Yet, in Defendant's mind, his cultivation of clients meant, to him, a partnership that could simply be dissolved. He appears to adhere to what George Costanza told Jerry on *Seinfeld*, "It's not a lie, Jerry, if you believe it's true." The Defendant's ability to lie to others, whether for status at an evening poker game or to destroy a Jew from whom he felt a threat, reveals his potent mastery of The Dark Triad (Narcissism, Machiavellianism and Sociopathy), and his reveling in his relentless, inhumane destruction of Plaintiff's work-life suggests the Dark Tetrad (the above plus sadism) at work behind his skillful façade of often antisemitic lies.

32. Telos found immediate and continued success at the above-mentioned Real Estate Awards. Plaintiff sought no contact with Defendant at these events but Defendant enjoyably tortured Plaintiff by seeking him out and forcing a handshake in front of other attendees. It was not enough, from 2012-2021 and onward, for Whiting to have destroyed much of Portis' career. He had to try to further humiliate Portis at the event where he was, arguably, the biggest "macher" due to clients RED2 & 3 and assert his continued dominance over his Jewish prey. These encounters invariably left Plaintiff feeling depressed and disturbed.

33. In 2016, Plaintiff took his Former Employer to dinner at EJs in Skokie. Plaintiff had taken his boss to dinner several times over the years to discuss big picture career issues. By then, Portis' work in Northbrook had led to two new, successful developments. However, despite Plaintiff's hard work, his income had dropped precipitously from its levels his first seven years at the firm and he was well aware he was making much less than almost everyone else at Former Employer & Associates. FEW then told Plaintiff that he sincerely sought that Portis do well and he was also somewhat baffled. As they were leaving the restaurant, he then told Plaintiff, "Charlie, I never heard anyone at Wilkow or Parkway say anything negative about you." At that moment, Plaintiff was shocked. He assumed that FEW had *personally* verified with those firms Defendant's multiple assertions that "the client wants you off the account." It was an important shock to learn that in fact FEW had not ever

verified any of the complaints against him that had been so costly to Plaintiff (but not to Former Employer).

34. In late 2017, after the Me Too revelations, Portis and his wife travelled to New Orleans and visited the Whitney Plantation with its graphic and moving depictions of sugar slavery. Also, Plaintiff began a series of phone conversations with an old college/camp friend who practiced psychology in New York. These events culminated in Plaintiff's realization, in late 2017, that FEW had sometimes dealt unfairly with Plaintiff even long after Defendant had left Prior Employer and Associates. From 2018 through 2022 Plaintiff engaged legal counsel including Novack & Macey (now Armstrong Teasdale) and others to discover complete truths and pursue potential claims against FEW1. That litigation was ultimately settled in 2022 under agreements between Plaintiff and FEW1.

35. Starting in early 2018, Plaintiff began to diligently seek out the truth behind each of Defendant's devastating lies about him. In early 2018, Plaintiff met with REE1, who told him that Whiting was lying that his company had complained about Portis on 233 Michigan and lied about not wanting his help on Citicorp Plaza. Although REE1 was Telos Group's first Chief Operating Officer from about 2012-2015, by 2018 REE1 had not spoken with Whiting for some time. Plaintiff also contacted the Slandered Real Estate Broker (SREB), who confirmed that he had never said "vicious things" about Portis to the Wilkow Company and spoke to REE2, who confirmed he had never ordered Portis off the Naperville account. Plaintiff also heard through an associate that Respondent in Discovery and Conspirator Dru Shoemaker was bragging that she had made so much on the two projects at Naperville and O'Hare that she was essentially retired. As Plaintiff uncovered truths, which he reported to his then-counsel, he ultimately sought two meetings with Defendant and held a final settlement conference with FEW in 2022.

36. In 2019, as Plaintiff sought additional truth about FEW, Plaintiff asked, and Defendant agreed, to meet for coffee at One South Wacker Drive, one of Telos' many downtown office tower listings for RED 2 and RED 3 and their massive Chicago holdings. Defendant did convey to Plaintiff information about Former Employer, and stated that Former Employer had, around 2012, offered him a partnership and then, according to Defendant, reneged on that offer. Defendant Whiting also found a way to tell Portis a particular story. Portis had replaced a broker named "PE." Prior to PE's departure, Whiting told Portis of a time he, Former Employer and PE were talking about possible future hires including Portis, a Black man and a woman (all of whom would ultimately be hired at the firm). Defendant then smiled and told Portis PE had said, regarding the three future hires, "No way, there's no way this firm will ever hire the N*&ger, the Kike or the Skirt." Defendant actually used the both racial epithets (for Black and Jews) and then laughed. While Whiting did not CALL Portis a "kike," directly, he found a way to bring the conversation around to being able to refer to Portis as one. Portis had never, in person, before or after that meeting, been referred to or called a "kike" (at least not in his own presence). Defendant used this not-so-subtle epithet to again remind Plaintiff of his dominance; he could easily have said, "the k-word and n-word," (or not told the story at all), but instead used subtext to express his truth. Plaintiff then conveyed a memo about this meeting to his counsel

at Novack & Macey, including Defendant's use of racially insensitive language and his feelings of further being preyed upon by Defendant.

37. In November, 2021, Plaintiff asked Defendant for a final meeting, hoping for at least the dignity of a modicum of truth acknowlegement. Portis now knew, after years of effort, that all the key assertions Whiting had made to Former Employer to cause him to be thrown off his own suburban agencies and off downtown leasing entirely were lies. By then these lies had cost Plaintiff much of his career and caused decades of emotional trauma leading to periods of suicidal ideation. Portis simply wanted Defendant to acknowledge some truth. Plaintiff had teed up on his Music app the John Lennon song, "Gimme Some Truth," but he did not get to playing the song as Whiting chose to double down on every lie, sneering at Portis that all the people who had told Portis they had not asked for his firing simply "did not want to hurt your feelings Charlie." **Plaintiff then felt, again, that sense of outrage. Defendant inflicted intense emotional distress, once again, on Plaintiff and did so based largely on his White supremacist tendencies, continuing a pattern begun in 2003 and constituting continuing and ongoing violations of USC 42, 1981 as well as the Intentional Infliction of Emotional Distress, the tort originally known as "outrage."**

38. In August, 2022, Plaintiff and FEW settled Plaintiff's legal actions against FEW. At the meeting, Portis asked FEW if the original and terrible lie, that another Jewish man had said vicious things about him, had been concocted by Brian Whiting alone or by the two of them. FEW made it clear to Portis that this despicable slander of SREB and Portis had been created only by Whiting. Then FEW went on to say about his former employee, "Brian makes sh*t up. He makes stuff up all the time; he made stuff up about my son."

39. Plaintiff Portis grew up chiefly amongst Jewish people in Highland Park, Illinois. Within his Jewish community, he achieved reasonably high status through achievement at school and via accomplishments at work, including his creation of Chicago's first downtown kayak tour company, Wateriders. But recent work and events opened Plaintiff's mind to the ways Jews might be dehumanized outside of their own community. Isabel Wilkerson's masterful *Caste* described caste systems in India, Nazi Germany and America and reminds us that in America, just below White Protestants in the caste array were Catholics and Jews. Irish and Italian Catholics were initially not considered "white," and antisemitism was rampant among Catholics as the two "white but not really white" groups fought for status on the American caste ladder. In Douglas Blight's biography of *Frederick Douglass,* the author recounts Douglass' first journey to England aboard the Cambria. A Georgian slave dealer onboard was so incensed by the site of the dignified, well spoken Douglass strolling the deck that he was heard complaining, "I wish we could get him down in Savannah. We would use him up!" USC 42, 1981 is meant to ensure that non-Whites receive the same contract right as Whites. To a White Supremacist like Whiting, Jews are decidedly not White but rather things to be used up at the pleasure of Whites. If a Jew has something to offer Whiting (RED1, RED2, RED3), he will be obsequious and fawning. If a Jew has outlived his usefulness, he will be disposed of. Defendant has treated Plaintiff, and other Jewish people, as tools to be utilized by a White. In the film adaptation of *Killers of the Flower Moon,* Robert DeNiro plays William

"King" Hale, who pretends to befriend the wealthy Osage Native community in order to draw them close and steal their wealth. To Hale, the Native peoples were there to be gaslighted as he desired, his Whiteness providing, by his values, full justification. Based on Whiting's actions and massive success in Chicago, Jews are to Whiting as the Osage were to Hale.

40. The value of the lost income on just the three projects described was at least $995,000 in 2006. Using a 7% interest rate, the lost income due to Defendant's fraud, slander and USC 42, 1981 violations would total $3.7 Million, not including punitive and compensatory damages related to the ongoing, and continuing, Intentional Infliction of Emotional Distress.